IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL J. DETTLAFF,

                    Plaintiff,                          OPINION AND ORDER

   v.
                                                        15-cv-463-wmc

MARY WAYNE, *et al.*,

                    Defendants.

     *Pro se* plaintiff Michael J. Dettlaff is asserting claims against multiple employees of the Wisconsin Department of Corrections ("DOC") for alleged violations of his First, Eighth and Fourteenth Amendment rights due to the conditions of his confinement and delay in the delivery of his legal mail. Now before the court is defendants' motion for summary judgment. (Dkt. #58.) Since the evidence of record does not support a judgment in Dettlaff's favor on any of his claims, the court is granting defendants' motion and will direct judgment in their favor.


UNDISPUTED FACTS[1]

## I.      The Parties.

     Michael Dettlaff was a prisoner at DOC's Prairie du Chien Correctional Institution ("PDCI") from July 20, 2009, to August 7, 2012, his mandatory release date. PDCI is a

---

[1] The following facts are material and undisputed unless otherwise noted. The court has drawn these facts from the parties' proposed findings of fact and responses to those facts, as well as the underlying evidence, and views them in a light most favorable to plaintiff, drawing all reasonable inferences in his favor, as the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986).

medium security institution that houses approximately 500 inmates.

Dettlaff is proceeding against fourteen defendants, all of whom were employed by the DOC at PDCI, for either all or a portion of the relevant time period. Eight of the named defendants are: Gary Boughton, the warden from July 2010 to March 2014; Mary Wayne, the security director; Gerald Anderson, the security captain; Richard Skime, a security lieutenant; Patricia Bailey, the mailroom officer from November 1, 2010, to February 28, 2011; David Bowen, the property room sergeant from November 1, 2010, to February 28, 2011; Lieutenant Russell Bausch, the property room supervisor from November 1, 2010, to January 4, 2011; and Captain Denny Reger, the property room supervisor from January 5, 2011, to February 28, 2011. Six additional defendants were either designated segregation security supervisors or correctional officers responsible for shifts in the segregation unit as needed between November of 2010 and January 2011: Tonja Hesselberg, Mark Kartman, Shawn Togerson, Marie Shima ("Wade"), Lisa Krachey and Maureen Kumlin.

## II.    DOC's Prohibition of Solicitation

When Dettlaff was first incarcerated, he signed an acknowledgement that he was responsible for reading the DOC's Disciplinary Rules, Administrative Code Chapter DOC 303. One of those rules prohibits soliciting staff. The relevant subsection contemplates punishing a prisoner if he:

> (6)    Conveys affection to, or about staff verbally or in writing whether personally written or commercially written or by drawings; or asks for addresses, phone numbers, favors, or requests special attention of an employee, or an acquaintance of an employee, or family of an employee.

Wis. Admin. Code § DOC 303.30(6) (formerly § DOC 303.26(6)) (emphasis added). The Appendix to the former DOC § 303.26, which was included in the materials Dettlaff received, further provides an additional explanation for this rule and how inmates can expect it to be applied. Specifically, the appendix includes the following statement:

> This section forbids all types of contacts between inmates and staff which could lead to favoritism or bribery. Just as theft would be very difficult to control in prison without a rule prohibiting all transfer of property (See DOC 303.40), so bribery and favoritism would be difficult to control in the absence of a rule prohibiting all exchanges between staff and inmates. Also, the appearance of impropriety may be as destructive to inmate or staff morale as would actual impropriety. The existence of unwritten exceptions tends to undermine respect for the rule as a whole because it may appear to the inmates to represent either half-hearted or arbitrary enforcement.

(Ex. 1001 (dkt. #60-2) at 3.)[2]


## III.    Dettlaff's Conduct Report for Violating § DOC 303.26(6)

On November 1, 2010, Dettlaff was with another inmate in the chapel area when an Officer Suthers, who is not named as a defendant, came by to conduct rounds. According to Dettlaff, he nodded at Suthers as she passed by, in the same manner Dettlaff would have nodded to acknowledge any officer. However, Suthers accused Dettlaff of winking at her, and she issued him Conduct Report #2200587 for violating § DOC 303.26(6). Dettlaff was then moved to "Temporary Lock-Up" ("TLU") pending the

---

[2] While Dettlaff claims that he did not have access to the appendix, this claim directly contradicts Dettlaff's own, written acknowledgment of receipt of the rules. Regardless, the explanation and expectations are largely common sense, and merely amplify the rule that Dettlaff admits receiving. Accordingly, his claim to the contrary creates neither a genuine nor a material dispute of fact. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

outcome of this conduct report. TLU is the term that DOC uses to define the period of time that a prisoner is held in segregation-like conditions pending a hearing on a disciplinary charge.

Security Director Wayne reviewed the conduct report and concluded that it should proceed to a disciplinary hearing as a major offense. This conclusion has support in DOC policy; solicitation is an offense against order under Wis. Admin. Code § 303.68(4) and Table 303.84, and it constitutes a major offense. On November 3, 2010, Officer Mumm served Dettlaff with a Notice of Major Disciplinary Hearing Rights and Waiver of Major Hearing and Waiver of Time. Dettlaff signed the form indicating that he waived the major due process hearing rights and time limits.[3] (Ex. 1000 (dkt. #60-1) at 5-6.)

On November 10, 2010, Lieutenant Skime held a major disciplinary hearing on Conduct Report #2200587. Dettlaff denied winking, smiling or any conduct that would support a solicitation charge. When Skime gave him the opportunity to make a statement, Dettlaff responded:

> I was standing, facing another inmate. She walked past me and she looked back at me and nodded at me. Just like she has acknowledged that I was there. As a knee jerk reaction I nodded back. If I winked at that time I don't know. She said do you have something in your eye. She said did you wink at me. I said I thought you winked at me. As I left the library she was waiting in the hallway. She said I put a warning on you[r] card. I knew she was up to something that's why I didn't say anything to her. I didn't say I got a warning for that. I just walked away.

(Ex. 1000 (dkt. #60-1) at 4.)

---

[3] While Dettlaff claims that Mumm coerced him into signing the forms, Dettlaff does not dispute that he signed the form, and any dispute related to this waiver is not material to his claims in this lawsuit. Indeed, Dettlaff did not request leave to proceed on any claims related to the forms he signed before his hearing, nor has he sought to amend his complaint to include such a claim.

Skime found Dettlaff guilty of solicitation on the ground that Dettlaff "likely" winked at Suthers, and because Skime deemed winking to be a way of conveying affection. In Skime's view, it was more likely than not that Dettlaff engaged in the conduct outlined in the report. Furthermore, Skime believed that Dettlaff's behavior at the hearing suggested that he did not respect the charges in the conduct report and instead expected arbitrary enforcement of the policy. In reaching this conclusion, Skime also reviewed Dettlaff's conduct report history and found it persuasive that Suthers had not written Dettlaff any other conduct reports. Rather, Skime discovered that in 2010 alone, Dettlaff had already received a total of 11 conduct reports, which in Skime's view represented a pattern of behavior suggesting a complete disregard for prison rules, as well as disrespect for staff and other prisoners.

Accordingly, defendant Skime sentenced Dettlaff to 180 days disciplinary segregation. Skime imposed this penalty based on Wis. Admin. Code § DOC 303.84(1)(i), which permits segregation or disciplinary separation as a penalty if the prisoner is found guilty of one or more violations of the rules, and Table 303.84 of the rules, which provides that a prisoner is subject to up to 360 days of disciplinary separation for violation of DOC § 303.26. Skime's listed reasons for imposing 180 days in particular were: Dettlaff's prior disciplinary history, his knowledge of the institution rules and disregard for them, the risk of possible disruption that his behavior could have created, his awareness that he was committing an offense and his motivation, his attitude towards the offense and how it affected Officer Suthers, and his apparent intent to undermine the DOC's procedures. Furthermore, Skime reasoned that since Dettlaff had already received three different

disciplinary separation dispositions for 30 or 60 days so far between June of 2010 and October of 2010, Dettlaff would likely commit another rule violation upon release from disciplinary separation. Thus, Skime avers that the lengthier 180-period was imposed with an eye towards deterrence.

Dettlaff appealed this disposition to Warden Boughton. On November 11, 2010, defendant Boughton denied the appeal and affirmed the punishment. Boughton agreed that winking, while seemingly trivial, carries serious safety and security concerns, because that type of behavior undermines staff authority and could lead to a friendly or amorous relationship between prisoners and staff. In Boughton's experience, such relationships pose security concerns because they undermine staff authority and potentially place staff in compromising situations. Indeed, Boughton states that such relationships within the DOC have "wreaked serious consequences upon both institutional safety and the staff member personally," which is why he approves of strictly prohibiting prisoners from soliciting staff. (Boughton decl. (dkt. #65) ¶ 8.) Accordingly, Boughton agreed that the 180-day disciplinary separation sentence was appropriate given Dettlaff's significant overall disciplinary record, the risk of disruption his behavior could have caused, his knowledge that he was committing an offense, and his attitude toward the offense and Officer Suthers.

## IV. Dettlaff's Conditions While in Segregation.

In addition to the 10 days that Dettlaff was in temporary lockup status from November 1, 2010, until November 10, 2010, Dettlaff ultimately served 89 days in disciplinary separation from November 10, 2010, until February 7, 2011, for violating

§ 303.26.  Defendants describe several aspects of Dettlaff's 89-day stay in disciplinary separation.  Without directly disputing defendants' description, Dettlaff provides additional details about the nature of his confinement, all of which are summarized here.

As an initial matter, Dettlaff was offered showers at least twice per week, and he received numerous the opportunity for outdoor recreation.  While not disputing that he had some opportunity for outdoor recreation, Dettlaff adds that "[d]uring the entirety of [his] time in solitary confinement, going outside for 'recreation' was nearly non-existent because the outdoor pens were not shoveled . . . and proper cold season clothing was not provided besides a coat."  (First. Am. Comp. (dkt. #33) ¶ 17.)

Next, defendants represent Dettlaff was afforded out-of-cell law library time on 33 occasions during his time in disciplinary separation, citing their Exhibit 1013, which was the log used to track plaintiff's adjustment during his time in disciplinary separation.  (Ex. 1013 (dkt. #63-9).)  Dettlaff disputes the accuracy of the log, claiming that he actually received only one hour per week, although this would still total a minimum of 12 hours of library time.  Additionally, Dettlaff complains about the conditions of his law library time, describing it as a "closet-like booth, behind a steel door with a small food tray slot in the middle."  Dettlaff further states that to access the search engine LexisNexis, the guards would bring an old computer on a cart to the front door, requiring him to reach through the slot in the door to use the keyboard.  (Dettlaff Aff. (dkt. #75) ¶ 65.)

Defendants further represent that Dettlaff was able to make phone calls during his time in disciplinary separation, again citing Exhibit 1013, which also includes some notations indicating that plaintiff used the telephone on certain dates.  While Dettlaff

complains that he has never received a copy of Exhibit 1013, he should have sought a copy and even a delay in having to respond to defendants' motion until provided one. Regardless, plaintiff does not dispute that he was able to use the telephone during his stay in disciplinary separation.

Finally, the parties both provide details about the physical conditions in Dettlaff's cell. Dettlaff was placed in a single-person segregation cell with another inmate, where he was forced to sleep on a mat on the floor between the other inmate's concrete bed-slab, a wall and the toilet. He filed grievances asking to be removed from the floor, but those were rejected. Dettlaff's cell was also cold, yet he was allowed only two thin blankets and one short-sleeved t-shirt, whereas those in general population had undershirts, thermal underwear and sweatshirts at that time of year. After his cellmate complained about the cold temperature, a complaint examiner came to the cell to investigate, which led to Dettlaff receiving a third blanket. Dettlaff's cell also had a lighting problem; the florescent lightbulb was failing and flashed in a strobe-like manner for several weeks.

## V.  Dettlaff's mail

During his time in disciplinary separation, Dettlaff was also litigating a state court case regarding the repossession of his home. Since the limitations of disciplinary separation made litigating his case more difficult, Dettlaff enlisted the help of his brother, and the two communicated using the mail. Specifically, Dettlaff sent his brother a draft of his appellate brief so that his brother could format it for him. While his brother's secretary mailed it back to the prison via UPS, Dettlaff never received it when he was in segregation. Dettlaff asked Bailey to check into it, but Bailey responded that the brief had not arrived

at the prison. When Dettlaff returned to general population, he was given his mail, including the brief, which had been sitting in the property room since December 6, 2010. Meanwhile, Dettlaff's state court appeal had been dismissed in light of his failure to meet the filing deadline for his brief.

According to Officer Bailey, the mailroom at PDCI does not handle packages, which would have included Dettlaff's brief. Rather, when packages arrive at PDCI, if it is not apparent that the mail is either from a court or attorney, the lobby officers x-ray and log the packages, then put them in the delivery cart to bring to the property department, which in turn handles the packages.

Defendant Bailey further represents that because Dettlaff's package had a property receipt/disposition form filled out, his package was processed by the lobby officers and the property department staff, not the mail room staff. Under those circumstances, Bailey explains that such a package would be delivered to Dettlaff only after his release from disciplinary separation.

## VI. Exhaustion of Administrative Remedies

According to non-defendant inmate complaint examiner ("ICE") Mandy Mathson, Dettlaff never filed an inmate complaint alleging that Bowen, as the property room sergeant, or Bailey interfered with his legal mail, and although Dettlaff did submit grievances about his cell conditions, he did not fully exhaust his right to appeal. Specifically, on November 5, 2010, Dettlaff filed PDCI-2010-23130, in which he complained about having to sleep on the floor on a mat rather than a mattress. (Ex. 1009

(dkt. #63-5) at 6.) He listed Captain Hesselberg as a person who would have information about the complaint, but did not allege that he ever discussed his conditions with Hesselberg. Even though PDCI has had space issues and does not, as a matter of policy, issue prisoners in segregation clean mattresses, ICE Mathson recommended dismissal of plaintiff's complaint on November 15, 2010, because Mathson was further able to confirm that Dettlaff had been issued a mattress, not a mat, and thus had adequate bedding. (*Id.* at 2.) Warden Boughton accepted that recommendation and dismissed the complaint on November 18, 2010.

On December 9, 2010, Dettlaff filed PDCI-2010-25560, complaining about "frigid conditions" in his cell, inadequate clothing and just two "very thin threadbare" blankets. (Ex. 1012 (dkt. #63-8) at 6.) Similarly, Dettlaff reported only having one v-neck short sleeved shirt and requested undershirts and long underwear. Dettlaff's cell was investigated that day. Examiner Mathson later reported that Dettlaff had two blankets at the time of investigation, one thin and one thick, and the cell temperature was 61 degrees. Mathson added that since Dettlaff wrote the complaint, he received a third blanket and noted that while the cell was cooler than other cells, maintenance was working on getting more heat into the cell. Finally, she concluded that the "issuance of a T-shirt is not recommended," and she recommended that the complaint be dismissed, with the modification that an informational copy of PDCI-2010-25560 would be sent to the segregation supervisor. On December 21, 2010, Warden Boughton also accepted this recommendation and dismissed the complaint with the modification.

There is no dispute that Dettlaff did not appeal Boughton's dismissal of either

PDCI-2010-23130 or PDCI-2010-25560. Plaintiff nevertheless avers that the dismissal of PDCI-2010-23130 was the product of deliberate indifference. (Dettlaff Aff. (dkt. #75) ¶ 32.) Dettlaff further avers that subsequent to his complaint, maintenance never visited his cell and the cell's temperature never improved. (*Id.* ¶ 39.) Even though he claims to have been dissatisfied with the results of the his complaints, however, Dettlaff does not explain why he failed to appeal either dismissal.

OPINION

The court granted plaintiff leave to proceed on: (1) his Eighth and Fourteenth Amendment claims against defendants Boughton, Wayne and Skime, for their part in punishing him for violating § DOC 303.26(6) and for imposition of a lengthy term in disciplinary separation; (2) his Eighth Amendment claims against defendants Tonja Hesselberg, Mark Kartman, Gerald Anderson, Denny Reger, Togerson, Wade, Krachey, Russel Bausch, and Kumlin regarding the conditions of his confinement in disciplinary separation; and (3) his First Amendment claim against Bailey and Bowen. Defendants seek summary judgment on all of his claims.

In resolving defendants' motion, the court draws every reasonable inference in favor of plaintiff. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). Still, plaintiff is obliged to come forward with "evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). To meet this burden, "[t]he nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* For the following reasons,

the court has concluded that the undisputed evidence of record requires judgment in defendants' favor as to each of plaintiff's claims.

## I. Fourteenth Amendment

The court permitted plaintiff to proceed on a claim that his time in disciplinary separation punishment violated his Fourteenth Amendment due process right to fair notice that winking at a guard could result in severe punishment. *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987) ("It is a fundamental precept of constitutional law . . . that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process law."); *Toston v. Thurmer*, 689 F.3d 828, 832 (7th Cir. 2012) ("A deprivation of liberty without fair notice of the acts that would give rise to such a deprivation violates the due process clause[.]").

The threshold question for any due process claim is whether the plaintiff was deprived of the type of "life, liberty, or property" interests protected by the due process clause. In the prison context, deprivations of a liberty interest amounting to an "atypical and significant hardship" bring the due process clause into play. *Sandin v. Conner*, 515 U.S. 472, 484 (1995). A prisoner's placement in segregation may create just such a liberty interest "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009); *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014). Even a brief stay in disciplinary segregation can constitute a deprivation of liberty

"depending on the condition of confinement" and whether "additional punishments" were imposed. *Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) ("Six months is not an apt presumptive minimum for establishing a violation.").

Defendants argue that plaintiff's time in disciplinary separation did not result in a loss of liberty because it was only 89 days, and the conditions were not unusually harsh. Pointing to plaintiff's access to recreation, law library time and showers, defendants rely on the Seventh Circuit's decision in *Hardaway v. Meyerhoff*, 734 F.3d 740 (7th Cir. 2013), which found a prisoner's 182-day stay in disciplinary separation was not sufficient to implicate a liberty interest. *Id.* at 744. In particular, the *Hardaway* court found it significant that during the plaintiff's time in disciplinary separation, the prisoner "was not deprived of all human contact and was permitted to use the shower and prison yard once every week." *Id.* Applying *Hardway* here, the circumstances of plaintiff's 99 days in disciplinary separation would appear to preclude finding a loss of liberty.

As an initial matter, plaintiff does not dispute that he had a cell mate, access to the shower twice a week, used the law library resources at least 12 (and the contemporaneous records show 33) times, made phone calls, got a haircut, and had the opportunity for outdoor recreation. There is no question, therefore, that plaintiff was not deprived of all human contact and, by all accounts, interacted with others on a regular basis and was able to litigate his lawsuits using the law library computer. While plaintiff has complaints about the *quality* of his recreation and law library time, these disputes do not suggest that he was *denied* either resource, just that his experience was not on par with what it had been when he was housed in the general population. Specifically, plaintiff avers that he refused

opportunities for outdoor recreation time because the outdoor areas were not shoveled and the only outdoor gear he was given was a coat. However, he neither avers that there was snow on the ground throughout the entirety, or majority, of his stay in segregation, nor that the temperatures were so low that a coat was wholly inadequate. Similarly, plaintiff complains that his law library time was overly restrictive because he was forced to access the research computer in a small booth. But plaintiff's own description of his law library time confirms that he was able to access the search engine and do legal research. Under similar circumstances, the Seventh Circuit has held no liberty interest was implicated. *See Singh v. Gegare*, 651 F. App'x 551, 555 (7th Cir. 2016) (prisoner served 105 days of disciplinary segregation and was permitted several hours of yard time and showers a week).

The result is the same even considering plaintiff's additional complaints about the conditions of his cell. Plaintiff claims that he had to sleep on a mat near the toilet and endure cold temperatures without adequate clothing or bedding. However, plaintiff does not dispute that the actual temperature in his cell was 61 degrees on December 9, 2010, as Mathson found in investigating plaintiff's grievance about the temperature. While plaintiff also complains about a flickering light in his cell, he cites no authority suggesting that this unpleasantness for a few weeks amounts to a loss of liberty. Furthermore, while in disciplinary separation, there is no dispute plaintiff was able to file grievances about both his bedding and the temperature in his cell, with a degree of success. Indeed, as a result of those grievances, in early November of 2010, Mathson visited cell and determined that plaintiff actually had a mattress, it just was not new, and by mid-December plaintiff had received a third blanket for added warmth. In contrast, it does not appear that he

grieved the flickering light. While plaintiff was still dissatisfied with the conditions of his cell, the relief provided undermines a claim that his conditions were "atypical" or a "significant hardship."

Indeed, the Seventh Circuit has held that similar conditions and lengths of time were insufficient to amount to a deprivation of a liberty interest. *See Obriecht v. Raemisch*, 565 F. App'x 535, 539-40 (7th Cir. 2014) (78-day confinement with mattress placed directly on wet floor not unconstitutional); *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (90-day disciplinary segregation with severe restrictions on exercise, group worship and educational opportunities not atypical or significant); *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1997) (70-day confinement with another inmate in one-man cell for 24 hours a day does not implicate liberty interest). Accordingly, when taking into account all of the conditions plaintiff dealt with between November of 2010 and January of 2011, a reasonable jury could not conclude that plaintiff's experience amounted to the type of atypical and significant hardship that amounts to a loss of liberty. Therefore, the court will grant judgment in defendants' favor on this claim.[4]

---

[4] While plaintiff was not granted leave to proceed on a First Amendment claim, the court notes that such a claim would have failed on this record, in which defendants have submitted evidence of a legitimate penological interest in deferring prisoners from winking at staff. That said, defendants should not well that had the record supported a finding that plaintiff suffered a deprivation of liberty, the "fair notice" due process analysis would be quite problematic for them. To determine whether DOC § 303.26(6) gave plaintiff fair notice that his wink might be punished, one begins with the language of the regulation, but § 303.26(6) does not explicitly render a wink, or even gestures, punishable. Instead, it punishes a prisoner if he "conveys affection to, or about staff *verbally or in writing* whether personally written or commercially written or by drawings," thus arguably excluding all non-verbal or unwritten communications from behavior that is punishable.

To justify their interpretation of the regulation, defendants cite to the Appendix to DOC § 303.26, but at most the appendix muddies the waters. The appendix to § 303.26 explains that this policy prohibits "all types of contact between inmates and staff which could lead to favoritism or bribery." (Ex. 1001 (dkt. #60-2 ) at 3.) It does not speak to or clarify exactly what is meant by

## II.   Eighth Amendment proportionality

Next defendants seek judgment on Dettlaff's Eighth Amendment proportionality claim. As noted at screening, while the case law on this type of claim is sparse, the Seventh Circuit has recognized "forms of punishment that are permitted for serious crimes may violate the clause if imposed for trivial ones." *Pearson v. Ramos*, 237 F.3d 881, 885 (7th Cir. 2001) (*citing Solem v. Helm*, 463 U.S. 277 (1983), *Rice v. Cooper*, 148 F.3d 747, 752 (7th Cir. 1998); *Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997); *United States v. Saccoccia*, 58 F.3d 754, 787-89 (1st Cir. 1995)). The Seventh Circuit has also held that such a claim could conceivably apply to prison discipline. *Pearson*, 237 F.3d at 885.

In *Pearson*, the court concluded that a 90-day denial of yard privileges for serious and violent infractions was not cruel and unusual punishment. *Id.* In doing so, however, the court also stated that "we can imagine the norms [of proportionality] being violated by imposing a 90–day denial of yard privileges for some utterly trivial infraction of the prison's disciplinary rules." *Id. See also Leslie*, 125 F.3d at 1135 ("[A] punishment imposed for no

---

the clause "verbally or in writing"; in particular, whether *gestures*, like the wink at issue here, fall into subsection (6) of § 303.26 as a category of punishable actions. Given that the record contains no evidence suggesting that plaintiff, or any other prisoner, had been warned that a gesture could result a conduct report for solicitation, the court cannot conclude that plaintiff had fair notice that he would be punished for winking at Suthers. Alternatively, defendants argue that the court should defer to the prison officials, but this argument also misses the mark. For one, defendants cite to *Toston*, 689 F.3d 828, for this proposition, but the *Toston* decision *only* discussed deference to prison official's decision-making in analyzing plaintiff's separate free speech claim. 689 F.3d at 831. While certainly the court's analysis of a First Amendment claim requires deference to prison officials' expertise in evaluating whether limitations on speech are tied to legitimate penological interests, defendants cite no authority for the proposition that due process permits prison officials punish *more* behavior than explicitly prohibited in the regulation, even if the conduct clearly falls under the intent of the regulation. Rather, the due process analysis in this context must be through the viewpoint of a reasonable *prisoner*. Since the language of DOC § 303.26(6) limited prohibited behavior to "verbal or written" conveyances of affection, it would appear that plaintiff did not have fair notice that he would be punished. This is a defect that DOC would be well served to address.

offense at all is, as a matter of mathematics, disproportionate."). Defendants argue that based on the evidence of record and the state of the law in 2010, however, qualified immunity shields Boughton, Wayne and Skim from liability for monetary damages. The court agrees.

Qualified immunity protects government employees from liability for civil damages for actions taken within the scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (quotations and citations omitted). While plaintiff is not required to cite "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (internal quotations omitted).

Most recently the United States Supreme Court reiterated that the "clearly established standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, 2018 WL 491521, at *10 (2018) (internal citations omitted). In short,

qualified immunity "give[s] government officials breathing room to make reasonable but mistaken judgment about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Although qualified immunity is an affirmative defense, the plaintiff has the burden of defeating it once the defendant raises it. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Even construing the facts in plaintiff's favor, it would be unreasonable to conclude that in 2010, Skime, Wayne or Boughton had reason to believe that the 180-day sentence violated plaintiff's Eighth Amendment rights.

At screening, the court noted the dearth of precedent analyzing the merits of a proportionality claim in the context of a prison disciplinary decision. Nonetheless, plaintiff was permitted to proceed on this claim because the *Pearson* decision theoretically opened the door for such a claim in the circumstances alleged in the complaint. Now, with a more complete record, however, the court finds that defendants are entitled to qualified immunity because no there is no case law suggesting, much less putting defendants on notice, that this type of punishment would violate plaintiff's Eighth Amendment rights.

As an initial matter, plaintiff has been unable to direct the court to *any* even arguably analogous decision from 2010 or before involving an Eighth Amendment proportionality claim in the prison context. That leaves the court with the *Pearson* decision itself, which is inconclusive at best on the issue. In *Pearson*, the Seventh Circuit reversed a district court judgment entered in the prisoner's favor after a jury concluded that his Eighth Amendment rights were violated when he lost yard privileges because the prisoner's violations were not trivial. 237 F.3d at 884. The Seventh Circuit held that an Eighth Amendment claim might proceed if a prisoner lost 90 days of yard privileges "for some utterly trivial infraction of

the prison's disciplinary rules, though we cannot find any case to support such a suggestion." *Id.* at 885. However, the court also held that the prisoner's infractions in that case (attacking another prisoner, spitting in a guard's face and throwing items) suggested that it was unsafe for him to be around other prisoners, and that the denial of yard privileges thus had a sound grounding in promoting safety. *Id.* Given that the Seventh Circuit and the Supreme Court had yet to elaborate on the notion of an Eighth Amendment proportionality claim by 2010, and the more complete record explaining Skime's penological concerns in imposing the 180-day sentence, this punishment was *at worst* a reasonable if mistaken punishment.

To start, since Skime was authorized to impose a punishment of up to 360 days of disciplinary separation, the 180-day sentence was authorized, and plaintiff only actually served about 100 days of that sentence. Additionally, while plaintiff may dispute whether he had fair notice of the infraction, *see* footnote 4 *supra*, defendants have submitted other evidence that his type of behavior poses significant security threats and that plaintiff had a pattern of refusing to follow DOC policies more generally. While acknowledging that plaintiff's wink may seem innocuous, Skime and Boughton both explained that type of behavior poses a significant threat to the institution because it creates the possibility that

an officer might favor certain prisoners, or at least creates the impression of favoritism, which is similarly dangerous.[5]

Furthermore, plaintiff neither disputes that he had received several conduct reports leading up to Suthers' conduct report, nor that he was punished for those infractions with shorter stays in disciplinary separation, both of which were stated factors in Skime's decision to impose a lengthier sentence. While one may argue with whether Skime's decision to impose such a long term of disciplinary separation on this occasion might *actually* have a deterring effect, plaintiff had offered no basis to question her stated motivation or her authority to impose that sentence. Accordingly, the court concludes that even if a reasonable jury could find that the Skime's punishment violated plaintiff's Eighth Amendment rights under current law, defendants had no basis to know this was a clearly established right in 2010.

## III.   Eighth Amendment conditions of confinement

Plaintiff was allowed to proceed past screening on his Eighth Amendment claims against defendants Tonja Hesselberg, Mark Kartman, Gerald Anderson, Denny Reger, Togerson, Wade, Krachey, Russel Bausch, and Kumlin, having alleged that each of these individuals knew his cell conditions failed to meet minimal standards of humane confinement *and* took no corrective action. Defendants seek judgment in their favor on

---

[5] Defendants also point out that two other prisoners who had been found guilty of soliciting had received lengthy sentences -- one was for 120 days and another for 210 days -- at least suggesting the seriousness with which the institution treats soliciting. Neither punishment was in the context of a gesture. Without more context, it is impossible to assess its relevance whether *plaintiff's* infraction was trivial, nor whether the sentence was disproportionate to that infraction.

two, independent grounds:   (1) plaintiff failed to exhaust his administrative remedies with respect to these claims prior to filing this lawsuit; and (2) these claims fail on the merits nonetheless.   Both have merit.

### A.    Exhaustion

Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   Generally, a prisoner must also "properly take each step within the administrative process" to comply with § 1997e(a).   *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).   This includes following instructions for filing the initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), and filing all necessary appeals, *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005), that are "in the place . . . at the time, [as] the [institution's] administrative rules require."   *Pozo*, 286 F.3d at 1025.

The purpose of this exhaustion requirement is to give the prison administrators a fair opportunity to resolve the grievance without litigation.   *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006); *see Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement").   If a prisoner fails to exhaust administrative remedies before filing his lawsuit, then the court must dismiss the case.   *Perez v. Wisconsin Dept. of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999).   Because exhaustion is an affirmative defense, however, *defendants* bear the burden of establishing that plaintiff failed to exhaust. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

To exhaust state administrative remedies in Wisconsin, inmates must follow the inmate complaint review process set forth in the Wisconsin Administrative Code § DOC 310. Under these provisions, prisoners start the complaint process by filing an inmate complaint with the institution complaint examiner within 14 days after the occurrence giving rise to the complaint. Wis. Admin. Code § DOC 310.09(6). The complaint may "[c]ontain only one issue per complaint, and shall clearly identify the issue." *Id.* § 310.09(e). If the institution complaint examiner rejects a grievance for procedural reasons without addressing the merits, an inmate may appeal the rejection. *Id.* § 310.11(6). If the complaint is not rejected, the institution examiner makes a recommendation to the reviewing authority as to how the complaint should be resolved. *Id.* § 310.11(6). The offender complaint is then decided by the appropriate reviewing authority, whose decision can be appealed by the inmate to a *correctional* complaint examiner ("corrections examiner"). *Id.* §§ 310.12, 310.13. The corrections examiner then makes a recommendation to the Secretary of the Department of Corrections, who takes final action. *Id.* §§ 310.13, 310.14.

Dettlaff filed grievances about the fact that he lacked a mattress and had to sleep on the floor (PDCI-2010-23130), as well the temperature of his cell and his lack of access to adequate clothing and blankets (PDCI-2010-25560). Yet since he did not obtain the relief he sought from the results of both PDCI-2010-23130 or PDCI-2010-25560 but

failed to appeal both, the court is persuaded that he has failed to exhaust his administrative remedies.[6]

Dettlaff's arguments in opposition are unavailing. First, he complains in general terms that Examiner Mathson dismissed all of his complaints, but futility is not an excuse from the exhaustion requirement. *Smith v. Zachary*, 255 F.3d 446, 452 (7th Cir. 2001) (rejecting futility and substantial compliance arguments due to the breadth of the PLRA's exhaustion requirement). Second, Dettlaff complains that the limitations of disciplinary separation prevented him from fully exhausting his claims. While exhaustion may not be required in circumstances in which prison officials take steps to actually "thwart inmates from taking advantage of a grievance process," *Ross v. Blake*, 136 S. Ct. 1850, 1960 (2016), plaintiff has not submitted any evidence suggesting that Mathson (or any other PDCI employee) actually denied him access to any of the ICRS forms. Indeed, the evidence suggests the contrary: plaintiff submitted 14 inmate complaints between November of 2010 and January of 2011, and he appealed two complaints that were dismissed during this timeframe. (*See* Ex. 1007 (dkt. #63-3) at 1-2.) Accordingly, defendants have

---

[6] In certain circumstances (not present here), a plaintiff would not need to pursue an appeal of a dismissed grievance. *See Thornton v. Snyder*, 428 F.3d 690, 695-97 (7th Cir. 2006); *see also Shaw v. Jahnke*, 607 F. Supp. 2d 1005, 1010 (W.D. Wis. 2009) ("[P]laintiff would have no reason to appeal the decision in which the examiner concluded that plaintiff's issue had been 'addressed' previously."). For example, in *Thornton*, the prisoner had filed an emergency grievance about his mattress. 428 F.3d at 692. The warden responded in a letter to the prisoner, telling him that his mattress concern did not constitute an emergency, but during the time frame that the prisoner could have appealed the warden's letter, the prisoner was moved to another cell. *Id.* at 695. In that circumstance, the Seventh Circuit concluded that the prisoner did not need to actually appeal the warden's letter because the exhaustion requirement does not require prisoners to "appeal grievances that were resolved as [] requested and where money damages were not available." *Id.* Here, plaintiff's averments about his continued dissatisfaction with his sleeping arrangement and the temperature of his cell confirm that plaintiff's grievances were never mooted, even if some were addressed in part.

adequately established that plaintiff failed to exhaust his administrative remedies with respect to his conditions of confinement claims.

### B.      Merits

The Eighth Amendment guarantees prisoners "humane conditions of confinement," *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), which include adequate shelter and "protection from extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). *See also Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006).   An Eighth Amendment "conditions of confinement" claim has two parts.  As a threshold matter, an inmate must show that the alleged deprivation was "sufficiently serious" on an objective basis such that an official's act or omission results in the "denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (*citing Farmer*, 511 U.S. at 834).  For claims based on low cell temperature, for example, several, objective factors may be relevant, including:  "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Dixon*, 114 F.3d at 644.  Second, the inmate must show that the prison official acted with a subjectively culpable state of mind, known as "deliberate indifference" -- that is, the official knew about the risk of harm, had the ability to prevent the harm, and failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).

The objective prong includes factual disputes that might normally render summary judgment inappropriate:  plaintiff claims that his cell was unacceptably cold and he lacked appropriate clothing and bedding, even although defendants submit evidence that his cell

temperature was 61 degrees and that plaintiff had three blankets and did not need additional clothing. Nonetheless, the undisputed record of how staff responded to plaintiff's complaints absolves them from liability here. For one, when the court permitted plaintiff to proceed against these additional defendants, it did so hesitantly because plaintiff had simply added the names of the supervisory staff that were scheduled to work in his segregation unit between November 1, 2010 and January 4, 2011. (4/6/2018 Order (dkt. #52) at 2-3.) In allowing plaintiff to proceed against all of them, the court therefore cautioned plaintiff that it was his responsibility to come forward with evidence of each defendant's *individual* knowledge of his cell conditions, as well as their failure to respond appropriately. However, he has offered *no* evidence suggesting that *any* specific defendant acted with deliberate indifference towards his conditions, nor even which of those defendants were advised of his complaints.

With respect to his complaint about sleeping on the floor, while plaintiff listed Hesselberg as an individual with knowledge in PDCI-2010-23130, and it appears that Mathson may have interviewed Hesselberg about plaintiff's allegation in resolving this grievance, the evidence of record does not suggest that Hesselberg had reason to dispute Mathson's conclusion that plaintiff had actually been issued a clean mattress, not a mat. As to his complaints about his cell's temperature, plaintiff avers that defendant Kartman was included on an email forwarding Mathson's resolution of PDCI-2010-25560. (Dettlaff Aff. (dkt. #75) ¶ 48.) Plaintiff claims that this email should have alerted Kartman to the freezing temperature in his cell. Even if Kartman received this email, however, he would have also learned that Mathson had reported that plaintiff had received a third blanket

and that his cell temperature was 61 degrees. As such, a reasonable juror could not conclude that Kartman's failure to do more constituted a reckless disregard for plaintiff's rights.

Furthermore, there is no evidence that defendants Anderson, Reger, Togerson, Wade, Krachey, Bausch, or Kumlin actually knew about plaintiff's complaints about the temperature of his cell or his sleeping conditions. While each of these individuals may have been working in the segregation unit where plaintiff was housed, he does not aver that he ever directed *any* of his complaints to these named defendants. Since "a defendant must have been 'personally responsible' for the deprivation of the right at the root of a § 1983 claim for that claim to succeed," *Backes v. Village of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011), each of these defendants are also entitled to judgment on this claim. *See also Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) (affirming summary judgment in defendants' favor where the record established that none of them knew about his condition or requests for medical attention).

In the end, the only evidence before the court related to the conditions of his cell is that, in response to plaintiff's complaint about the lack of bedding and temperature, "staff" (1) checked the temperature and found it to be 61 degrees, (2) provided plaintiff with a third blanket, (3) acknowledged that plaintiff's cell was colder than the nearby cells, and (4) took the step of working with maintenance to try to improve the temperature of the cell. Moreover, subsequent to plaintiff's complaints about his cell conditions, there is no evidence that he still complained about cold conditions to any of the named defendants. While it does not appear that plaintiff received the additional clothing initially requested,

he has not alleged any facts suggesting that after Mathson investigated the complaints about his cell in PDCI-2010-25560, plaintiff *actually* informed any of the defendants that his clothing was inadequate. Similarly, plaintiff has submitted no evidence suggesting that any of the named defendants failed to respond to a complaint about his mattress. Accordingly, judgment in defendants' favor is appropriate both because plaintiff failed to exhaust his administrative remedies and because no reasonable juror could conclude that any of them acted with deliberate indifference to plaintiff's exposure to constitutionally deficient conditions of confinement.

## IV.    First Amendment

Finally, plaintiff is proceeding against Bailey and Bowen for their respective involvement in withholding plaintiff's legal mail. Inmates enjoy First Amendment rights both to send and receive mail, *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999), and an "inordinate" delay in delivery of legal mail may violate those rights. *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996).

As an initial matter, defendants argue and plaintiff does not dispute that he failed to exhaust his administrative remedies with respect to Bowen, so judgment must be granted in Bowen's favor. Judgment in Bailey's favor is also appropriate, but on an additional ground: because the evidence of record does not support a finding that he was personally involved in the delay, a prerequisite for liability under § 1983. Indeed, the record does not support a finding that Bailey knew that plaintiff's legal brief was being held with the property department, nor that Bailey even knew about the letter. Assuming that another

PDCI employee should have ensured plaintiff's receipt of the UPS envelope when he was being held in disciplinary separation, *Bailey* cannot be held liable under § 1983 for failing to do another prison employee's job. *See Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) (citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)). Accordingly, defendants' request for summary judgment as both Bailey and Bowen will be granted.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #58) is GRANTED.

2) The clerk of court is direct to enter judgment in defendants' favor and close this case.

Entered this 5th day of November, 2018.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge